UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WARREN DEAN MAKO, individually and as personal representative of the ESTATE OF DONNA MAKO,

Plaintiff,

v.

BURLINGTON NORTHERN & SANTA FE RAILROAD, a corporation; NATIONAL RAILROAD PASSENGER CORPORATION AND SUBSIDIARIES, a.k.a. AMTRAK, a National Railway Passenger Corporation; COUNTY OF COWLITZ, a municipal entity in the State of Washington,

Defendants.

Case No. C07-5346FDB

ORDER GRANTING DEFENDANTS BNSF's and AMTRAK's MOTION FOR SUMMARY JUDGMENT OF DISMISSAL

**INTRODUCTION**

This cause of action arises from the July 3, 2006 collision of Donna Mako's automobile with a south-bound Amtrak train after she stopped to allow a north-bound Union Pacific freight train to pass on the first set of tracks in front of her vehicle. After the northbound Union Pacific train on the first set of tracks passed Donna Mako, she drove forward across the first set of tracks to the second set of tracks where her car was struck by the southbound Amtrak passenger train.

ORDER - 1

At the time of the accident, Donna Mako (Plaintiff's wife and her three passengers) were on Dwight Road heading west to return to the Mako home at approximately 4:45 p.m. The weather was sunny and clear. Amtrak Engineer Robert Klickman could not see the Mako vehicle, as his view was obscured by the Union Pacific train. (Wackerbarth Decl. Ex. J (Robert Klickman Dep.) at p. 41:7-17.) Engineer Klickman sounded the locomotive horn as the train approached the crossing because he thought his train would arrive at the same time the last car of the freight train would clear the crossing. (Wackerbarth Decl. Ex. J, p. 36; Ex. D at p. 4.) Horn testing on the subject locomotive on July 8, 2006, showed a decibel reading of 103.3dBA, exceeding the FRA requirement of a minimum of 96dBA. (Wackerbarth Decl. Ex. K (Report of Michael Fann; Ex. L (Mike Fann Deposition) at pp. 6:15-13:16.) Dwight Road is a Cowlitz County road that is .19 of a mile long from Barnes Drive ending at the eastern boundary of the railroad right-of-way. (Stone Decl. ¶ 6.) As one enters Dwight Road heading west, as Donna Mako was when she was returning to the Mako home on the day of the accident, one first encounters a "Dead End" sign, then a 25 mph speed limit sign; next comes a Railroad crossing sign. *Id.* Finally, on the side of Dwight Road, adjacent to the railroad tracks there is a sign stating "End of County Road" and a "Stop" sign. *Id.* These signs were put in place between 1973 and 1978. *Id.* The road that continues on the west side of the railroad tracks is not property of Cowlitz County, and this was so on July 3, 2006, the time of the accident. *Id.* ¶ 4. Warren and Donna Mako accessed their property by traveling down Dwight Road, passing over the railroad crossing, then driving to their home on a private road shared with other adjacent property owners.

The Department of Transportation registry lists this crossing as DOT#092479W. Before the above July 3, 2006 incident, there had been only a single accident at the crossing, and this occurred on December 13, 1988, and involved a truck traveling eastbound toward Dwight Road that drove into the side of a slowly moving train already in the crossing, resulting in property damage but no injury. (Wackerbarth Decl. Ex. C (12/13/88 FRA Report.)

ORDER - 2

The Makos began living on their property on the banks of the Cowlitz River in approximately 1994. In the four years before the incident, the Makos crossed the tracks more frequently than the two to six times a day that they had in the past. (Wackerbarth Decl. Ex. I (Warren Mako Dep.) at p. 5:19-24.) Warren Mako taught Donna Mako to drive, and she first obtained her driver's license in 2004. ( *Id.* at pp. 95:2-5; 202:24-25.) Warren Mako testified that the crossing was active, had two tracks, and had daily train traffic. ( *Id.* at 104:2-5; 147:8-11.) Warren Mako specifically instructed Donna when she was learning to drive about the crossing, the dangers posed by it, and the necessity to stop at the stop sign and look both ways, and he said that she was responsive to his instructions. ( *Id.* at p. 105:3-19.) Warren Mako also testified that he discussed a specific strategy with Donna for crossing the tracks when one train was occupying the crossing on the near track, obscuring visibility on the other track: "Well, the strategy was to stay there until you seen that the tracks were open and that there was no trains coming." ( *Id.* at p. 203:3-13.)

The two railroad defendants move for summary judgment. Cowlitz County has already been dismissed from this cause of action.

Amtrak moves for its dismissal arguing that although it had no duty to sound the horn at the Dwight Road crossing, the event recorder corroborates the testimony of Engineer Klickman that the horn was sounded, and, furthermore, that any claims based upon the locomotive's whistle or speed are preempted by federal regulations and federal case law. Finally there is no material issue of fact with respect to the claims against Amtrak.

Burlington Northern & Santa Fe Railroad (BNSF), the owner of the railroad tracks at the accident site, moves for its dismissal arguing that the sole proximate cause of the accident was Donna Mako's decision to cross the tracks before having a clear view of both tracks to the north, and that Plaintiff is unable to demonstrate the existence of any breach of duty owed by BNSF that proximately caused this accident.

ORDER - 3

1 **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if the moving party establishes that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). Inferences drawn from the facts are viewed in favor of the non-moving party. *T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630-31 (9th Cir. 1987).

Summary judgment is proper if a defendant shows that there is no evidence supporting an element essential to a plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Failure of proof as to any essential element of plaintiff's claims means that no genuine issue of material fact can exist and summary judgment is mandated. *Celotex*, 477 U.S. 317, 322-23 (1986). The nonmoving party "must do more than show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**DISCUSSION**

*<u>Amtrak's Argument</u>*

Amtrak contends that Amtrak Engineer Klickman's testimony that he sounded the locomotive's horn as it approached from the North is consistent with the event recorder data. Moreover, since the locomotive's horn easily met federal requirements as to its sound level (Wackerbarth Decl., Ex. K), then, Amtrak argues, all other claims with regard to the horn's audibility are preempted. *See First Security Bank v. Union Pacific R. Co.*, 152 F.3d 877 (8th Cir. 1998) (affirming district court's dismissal of allegation that horn was inadequate because there was no evidence that horn failed to comply with federal regulations). Amtrak further argues, that if Plaintiff pursues a claim that Amtrak failed to sound the emergency sequence, there is no evidence that Engineer Klickman's failure to blow the emergency pattern was the proximate cause of this

ORDER - 4

incident.[1] Amtrak argues that the sole proximate cause of the subject accident was Donna Mako's unfortunate decision to cross the tracks before obtaining a clear view, and cites RCW 46.61.340 and .345 and RCW 46.61.340(1), and RCW 46.61.190(2) that provide for motorists to stop and yield to oncoming train traffic. Thus, although Donna Mako had a statutory duty to stop at the stop sign and yield to oncoming train traffic, and although she was instructed by her husband to stay at the stop sign until she could see both tracks were open and there were no trains coming, she failed to exercise such due care at the crossing, and this conduct was the proximate cause of the accident.

### *Plaintiff's Response*

Plaintiff clarifies that his argument is not that Amtrak's horn was inaudible, rather, it is that Amtrak failed to utilize the horn appropriately. Plaintiff points to his "Human Factors Engineering" expert, Dr. Richard Gill for the proposition that a long continuous sounding of the train horn, rather than rapid on/off pulses, would have "little or no warning value." Plaintiff contends that the Amtrak Engineer violated Amtrak's own safety policy by not sounding the requisite emergency pattern of repeated short blasts when he perceived the emergency condition, thus failing to provide the Mako vehicle occupants with a proper alerting signal.

### *Amtrak's Reply*

First, Amtrak shows that Engineer Klickman had no duty under the operating rules to sound the horn at all upon his approach to the Dwight Road private crossing. (Decl. of Brian Heikkila, filed with Amtrak's summary judgment motion, Dkt. # 65, ¶ 3.)

Second, Amtrak contends that at the time Engineer Klickman sounded the horn, there was no "emergency" requiring him to sound the emergency pattern. Rule 5.8.2 of the General Code of Operating Rules ("GCOR") unequivocally states that the emergency pattern of a succession of short sounds is to be used under the following circumstances:

---

[1]Amtrak argued that federal law preempts any excessive speed claim, but Plaintiff responds that he has never contended that Amtrak's speed was excessive.

ORDER - 5

> [W]hen persons or livestock are on the track at a location other than road crossings at grade. In addition, use to warn railroad employees when an emergency exists, such as a derailment.

(Wackerbarth Decl. in support of Reply Brief, Ex. E (GCOR 5.8.2.) Amtrak argues that Engineer Klickman was not faced with circumstances where pedestrians, maintenance of way crew, or livestock were on the track, constituting an emergency. Additionally, as to the horn pattern, Amtrak argues that there is no evidence that Mr. Klickman's alleged failure to blow the emergency pattern was the proximate cause of this incident. Moreover, rather than blowing a steady horn sound as Plaintiff suggests, there was a three-blast sequence prior to arrival at the crossing. Amtrak argues that there is also no showing that Donna Mako would have perceived the emergency pattern when she apparently did not perceive three blasts of the Amtrak horn in the seconds immediately before the accident. Amtrak cites a case remarkably similar to the Mako case where the emergency horn pattern argument was rejected by the Court:

> As we have explained, the collision in this case did not become imminent until the decedents' car pulled onto the tracks. Thus, even assuming that the train crew must sound an emergency sequence when a collision becomes imminent at a crossing, the train crew had only a few short seconds to switch the horn from the automatic crossing sequence to the emergency sequence. Accordingly, we conclude that Plaintiffs cannot show the sequence in which the horn was sounded caused the collision. Furthermore, there is no evidence in the record to establish that the sounding of the emergency horn pattern earlier would have stopped the decedents from pulling onto the track in front of the train. Summary judgment for Amtrak was therefore appropriate.

*Price v. National Railroad Passenger Corporation*, 14 P.3d 702, 709 (Utah App. 2000).

### ***Conclusion Re Claims Against Amtrak***

Engineer Klickman sounded the locomotive horn in a three-blast sequence as the train approached the crossing because he thought his train would arrive at the same time the last car of the freight train would clear the crossing. (Wackerbarth Decl. Ex. J, p. 36; Ex. D at p. 4.) Engineer Klickman caught a glimpse of the Mako automobile for the first time as it was coming onto the crossing in front of him as the rear of the train passed. (Wackerbarth Decl. Ex. J (Robert Klickman

ORDER - 6

Dep.) at p. 41:7-17.) The physical evidence examined at the scene reflects the engineer's testimony. (Decl. of Keith Cronrath, Professional Engineer, of the firm Cronrath & Tompkins, Forensic Engineers, p. 21, ¶ 3.) Mr. Cronrath estimates that at the time Engineer Klickman glimpsed the Mako automobile, "the car and the Amtrak train would be approximately 1.12 seconds from impact. This would probably not be enough time for either the Amtrak engineer or the driver of the Honda to react and make an avoidance maneuver." *Id.* Engineer Klickman blew three whistle blasts before he arrived at the intersection. Obviously, Donna Mako did not heed these three warning horn blasts, and it is unlikely she would have responded to the emergency pattern of repeated short blasts as suggested by Dr. Gill. Dr. Gill's analysis of the circumstances and his opinions on safety and risk management are not helpful to the Court. In fact, Keith Cronrath's analysis and opinions regarding other expert reports is persuasive in this regard. (Cronrath Decl. pp. 54, *et seq.*) Under all the circumstances, there being no genuine issue as to any material fact, Amtrak is entitled to judgment as a matter of law, as Amtrak did not breach any duty with respect to sounding its horn at the Dwight Road crossing.

### ***BNSF's Argument***

BNSF argues that this Court has already concluded that Dwight Road is private, and it is undisputed that BNSF owns the railroad tracks involved in this case. BNSF argues that the Makos were licensees, entering upon BNSF's property with express or implied consent, not for mutual advantage. Under Washington law, a landowner is subject to liability for physical harm to a licensee only if (1) the possessor knows or should know of the condition and should realize that it poses an unreasonable risk of harm to the licensee; and (2) the possessor should expect that the licensee will not discover or realize the danger, and (3) the possessor fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and risks; and (4) the licensees do not know or have reason to know of the condition and the risk involved. *Tincani v. Inland Empire Zoological Society*, 124 Wn.2d 121, 133-34, 875 P.2d 621 (1994). BNSF argues that Plaintiff has met none of

ORDER - 7

these four conditions: (1) there being only one previous collision at this site, and with sixty-six different crossings in Washington State having had a higher number of crossing collision incidents than the Dwight Road crossing, these circumstances are insufficient to establish that BNSF knew or should have known that a dangerous condition existed at that crossing; (2) the Makos had lived in the area for twelve years and were aware of the two tracks at the Dwight Road crossing where passenger and freight trains going either direction traveled. Moreover, the Makos had developed a strategy for dealing with this crossing, that is, to wait at the crossing until the driver could see both directions that it was safe to cross. Thus, BNSF argues that liability cannot be assigned to it for failure to warn of a hazardous condition at the crossing.

Finally, BNSF argues that the opinions of Plaintiff's retained experts, Dr. Gill and Dr. Lee, do not create a genuine issue of material fact that BNSF should have installed active warning devices, such as gates and lights, at the Dwight Road crossing. BNSF argues that Dr. Gill has no experience in evaluating a railroad crossing from a design or safety standpoint, nor is Dr. Lee qualified to opine that the installation of gates and lights at the Dwight Road crossing would have made it a "safe" crossing. BNSF also argues that Drs. Gill and Lee do not have sufficient facts or data to make any conclusions regarding the adequacy of the warning devices at the Dwight Road crossing; their opinions, are therefore, not persuasive because they are not based on any objective criteria, experience, knowledge, skill, or training.

### *Plaintiff's Response*

Plaintiff argues that applying the success rate of automobiles using the crossing is as an indicator of the danger at the crossing is "absurd," and BNSF should have known that the crossing was unreasonably dangerous. In support of this conclusion, Plaintiff refers to Dwight Road neighbor Randy Dec who had a similar experience at the crossing where he could have been hit by a second train, and refers to Randy Dec's contacts with BNSF about trains that were stopped and blocking the crossing. Plaintiff relies on Dr. Gill's human factors analysis to explain how a person at a crossing

ORDER - 8

waiting for a freight train to pass would not appreciate the need to wait approximately thirteen additional seconds after the train cleared the intersection to reach the "minimum safe sight distance." Plaintiff also relies on Dr. Lee who opines that the appropriate wait time would have been an additional thirteen seconds after the freight train proceeded through the crossing, and that a layperson/motorist would not be able to make the same expert calculations to determine how long she would have to wait to safely pass through this crossing.

### *BNSF's Reply*

BNSF argues that Plaintiff has presented no evidence to support the conclusion that BNSF knew or should have known that the Dwight Road crossing posed an unreasonable risk of harm. Plaintiff's "willful blindness" assertion is based on an unsupported assertion that BNSF never inspected the crossing to determine whether it was safe for motorists. BNSF Director of Public Projects, Lyn Hartley, testified that "all our crossings have ongoing evaluations" by track people and train crews. (Wackerbarth Decl. in Support of Reply Brief, Ex. B (Hartley Dep.) at p. 14:5-11.) She explained that the railroad has done evaluations of the Dwight Road grade crossing, wherein assessments are made of the vegetation, the crossing geometric, the approaches, the types of vehicles using the crossing, the number of vehicles, as well as observations of train speeds and train count. (*Id.* at 18:13-23.) Randy Dec does not testify that he told anyone at BNSF that he was nearly killed at the Dwight Road crossing. Mr. Dec testified that the incident "was not close, but it was close enough to me to make me think, you know, if that train was any closer and I would have pulled out any quicker, I might have been killed." (Wackerbarth Decl. in Support of Reply Brief, Ex. C (Dec Dep.) at p. 45:22-25. Mr. Dec testified that the last conversation he had with anyone at BNSF was in May 2005, more than a year before the accident in this case. *Id.* at p. 41. BNSF points to the fact that of the more than 800,000 vehicles that had made the trip across the Dwight Road crossing since its creation in 1972, approximately 99.99987 percent of those vehicles did so without incident. (Wackerbarth Decl. in Support of Summary Judgment, Ex. G at pp. 76:19-77:10.)

ORDER - 9

BNSF argues that Donna Mako did not have a duty to perform "expert calculations" at the stop sign on the date of the accident to determine the proper wait time to safely cross the tracks. BNSF argues that Donna Mako did have a duty to exercise due care and to wait until she had a clear view of both sets of tracks before proceeding through the crossing, whether that took six seconds, thirteen seconds, or two minutes. BNSF argues that even if one accepts Dr. Lee's testimony that an appropriate wait time to reach a "minimum safe sight distance" at the crossing is thirteen seconds after a train proceeds through the crossing, then it was Donna Mako's obligation to wait thirteen seconds to obtain an unobstructed view of both sets of tracks before proceeding through the crossing, which she failed to do. Moreover, BNSF argues that it is undisputed that Donna Mako was thoroughly familiar with the Dwight Road crossing and the risks associated with proceeding across the tracks, having lived in the area for twelve years and having traveled across the tracks from two to six times a day, and she was aware that the crossing had two tracks and daily train traffic. BNSF points out that the Makos developed a strategy for crossing the tracks under the circumstances of the subject accident. Warren Mako testified that "the strategy was to stay there until you seen that the tracks were open and that there was no trains coming." (Wackerbarth Decl. in support of Summary Judgment, Ex. I, at pp. 203:3-13.)

While Plaintiff states that BNSF currently has "198 private crossings with active warning systems (Plaintiff's Opposition, p. 6), BNSF has nearly 9000 private crossings on its rail system throughout 27 different states from the Midwest to the West Coast and into Canada. (Wackerbarth Decl. in Support of Reply Brief, Ex. B (Hartley Dep.) at p. 37:21.) Thus, private crossings with active warning systems are a very small part of the total number of private crossings.

BNSF argues that Plaintiff's reliance on Drs. Gill and Lee is misplaced, also noting that their testimony is subject to a motion to exclude pursuant to FRE 702. The highway design engineer retained by Amtrak and BNSF, Ed Stevens, testified that the Manual on Uniform Traffic Control Devices ("MUTCD") does not address the issue as to whether or not, for safety reasons, flashing

ORDER - 10

lights and gates or barriers of some kind are required for this particular railroad crossing. Stevens also testified that the Railroad-Highway Grade Crossing Handbook had generic language regarding gates or lights in situations where there is inadequate site visibility due to permanent objects, i.e., vegetation. (Errata Re: Reply Brief; Wackerbarth Decl. in Support of Reply Brief, Ex. D (Stevens Dep.) at p. 35.) Edward Stevens, Professional Engineer with extensive experience in highway design, including the analysis of the design and safety of railroad crossings, having personally inspected the Dwight Road private crossing at issue in this case concluded as follows:

> In summary I find no defects or hazardous conditions at the private roadway-railway crossing at the westerly terminus of Dwight Road in Cowlitz County, within the focus of my Engineering Study. I find the quadrant sight distance, crossing surface, roadway/railway crossing alignment and geometry well within accepted engineering standards.

(Stevens Decl., p. 16, Ex. 2, Report.) BNSF points out that Drs. Gill and Lee did not discuss such criteria when forming their opinions in this case.

BNSF contends that whether or not Donna Mako skirted around the Union Pacific train, or whether that train was in the crossing or clear of it is immaterial for the purposes of this motion. BNSF, and Amtrak as well, contend that the following material facts remain undisputed: Donna Mako (1) failed to yield the right-of-way to oncoming traffic in the Dwight Road rail intersection when she proceeded across the tracks; (2) failed to wait until she had a clear view of the tracks to the north and failed to make sure there was no approaching train traffic before she proceeded across the tracks; and (3) failed to act in accordance with the specific strategy she had developed with her husband, which was to wait for a train to exit the crossing and her sight lines to clear before proceeding across the tracks.

### *Conclusion Re Claims Against BNSF*

The Court concludes that Donna Mako had a statutory duty to yield to oncoming train traffic. Her husband had instructed her, and he indicated that she was receptive to his instructions,

ORDER - 11

that it was necessary to remain at the stop sign until she could see that both tracks were open and clear of oncoming trains. Donna Mako did not exercise due care at the crossing on the day of the accident; she violated her statutory duty and ignored her husband's specific instructions by attempting to cross the tracks without waiting for a clear view of the tracks to the north.

The Dwight Road crossing was not unreasonably dangerous, and this is evident from the fact that there has been only one other accident at the crossing – a truck running into a slowly moving train causing only property damage – out of all the vehicles that have crossed the tracks since the crossing's inception in 1972. Additional support for this conclusion is provided by Professional Engineer Edward Stevens who has worked extensively in the area of analysis of the design and safety of railroad crossings: "I find the quadrant sight distance, crossing surface, roadway/railway crossing alignment and geometry well within accepted engineering standards."

Neither could reasonable minds conclude that the Dwight Road crossing was unreasonably dangerous because a lay person cannot make the complex calculation involved in determining the time to wait to cross safely. All that is required of a lay person at the crossing is to wait until the sight lines indicate that there is no train coming in either direction on either track, or that the train's distance away is such that the person can safely cross. As Professional Engineer Stevens concluded, the sight lines at the Dwight Crossing are such that visibility in both directions are well within accepted engineering standards. The opinions of Drs. Gill and Lee are not helpful, and other referenced evidence is more helpful and reliable.

Accordingly, there being no genuine issue of material fact, BNSF is entitled to judgment as a matter of law, as Plaintiff has failed to demonstrate any breach of duty by BNSF that proximately caused the accident. Donna Mako's failure to exercise due care at the crossing, her failure to yield to the oncoming train in violation of her statutory duty, and her failure to adhere to the strategy of waiting at the stop sign until she could see that it was safe to cross was the proximate cause of this accident.

ORDER - 12

### ***Defendants' Motion To Exclude Plaintiff's Experts Drs. Gill and Lee***

Federal Rule of Evidence 702 provides as follows:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts for data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principle and methods reliably to the facts of the case.

Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The trial court acts as a "gatekeeper" to exclude "junk science" testimony that does not meet Rule 702's standards. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999). "Maintaining *Daubert's* standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony," a concern that is also reflected in the prohibition on expert witnesses offering their legal conclusions. *El Sayed Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002). The trial court's reliability inquiry focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. *Daubert* set out a non-exhaustive list of four factors for a court to consider in determining whether the expert testimony is sufficiently reliable to be admitted into evidence: (1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community. *El Sayed Mukhtar*, 299 F.3d at 1064, citing *Daubert*. A trial court has broad latitude in determining whether an expert's testimony is reliable and also in determining how to determine the expert's reliability. *Id.*

In *El Sayed Mukhtar*, the Court of Appeals found it apparent from the record in the district court that the court said nothing about the *reliability* of the expert's testimony, merely admitting it

ORDER - 13

over objections, and, rather, was concerned only with whether the expert witnesses would testify on an "ultimate issue" that is properly for the jury to decide. The Court in *El Sayed Mukhtar* stated that surely more was required of the trial court.

The Court in *El Sayed Mukhtar* also noted that the trial court did not determine that the expert's testimony would be helpful to the jury. To be admissible, "expert testimony must ... address an issue beyond the common knowledge of the average layman." *Id.* at 1066.

Testimony concerning the ultimate issue is not per se improper. *Id.* FRE 704(a) The notes to FRE 704 provide, however, that abolition of the ultimate issue rule does not lower the bar so as to admit all opinions, that under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence that wastes time. In this way, the Rules "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach." (Notes to FRE 704) "When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *El Sayed Mukhtar*, 299 F.3d 1066, n.10, citing *United States v. Duncan*, 42 F.3d 97 (1994)(emphasis in original).

Applying the above law as to Plaintiff's experts Drs. Gill and Lee, the Court concludes that their testimony is not helpful and they are not qualified to render opinions in the context of this case. Plaintiff's proposed experts, Drs. Gill and Lee, would opine that the Dwight Road crossing "is obviously unsafe," and that any railroad crossing without lights and gates is "extremely dangerous." These conclusions are unsupported by any generally accepted, reliable evidence. Dr. Gill, a human factors engineering consultant, outlines the manner in which he contends the railroads should engage in risk management. There is nothing in Dr. Gill's prior education, training, and work history to suggest that he is qualified to offer expert opinion regarding liability and causation in this case. Dr. Lee, who has a degree in experimental nuclear physics, works in the field of accident reconstruction, but he has never been asked to evaluate a railroad crossing accident that involved a double mainline

ORDER - 14

track or circumstances similar to the present case. (Wackerbarth Decl., Ex. D. At pp. 78:17-19 and 84:7-19.) Dr. Lee formulates his opinions without reviewing all the physical and testimonial evidence present in this case, and assumed the location of the Mako vehicle as it approached the stop sign on Dwight Road. ( *Id.* at pp. 88:24-89:3.) Moreover, Dr. Lee is not qualified to interpret event recorder information and has had no formal training or instruction on how to properly interpret event recorder data. ( *Id.* at p. 40:17-23.) For these reasons, and those more fully elaborated by Defendants in their brief on their Motion to Exclude Richard Gill, Ph.D and F. Denman Lee, Ph.D., the motion will be granted, and the opinion testimony of these witnesses is excluded.

NOW, THEREFORE, IT IS ORDERED:

(1) Defendants BNSF's and Amtrak's Motion for Summary Judgment of Dismissal [Dkt. # 62] is GRANTED and this cause of action is DISMISSED;

(2) Defendants BNSF's and Amtrak's Motion To Exclude Richard Gill, Ph.D. and F. Denman Lee, Ph.D is GRANTED.

(3) All causes of action against all Defendants in this case having been dismissed, the Clerk of the Court shall enter Judgment in favor of Defendants Burlington Northern & Santa Fe Railroad, National Railroad Passenger Corporation (Amtrak), and Cowlitz County, and close this case.

DATED this 12th day of February, 2009.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 15